And we have three appeals on the docket this morning, and I see that counsel are ready for the first one. It's United States of America v. Anthony Lepore, and Mr. Kish is here for the appellant. Mr. Ghali for the government. Are you ready to proceed, Mr. Kish? Good morning. May it please the Court, my name is Paul Kish. I obviously represent Mr. Lepore. We've got issues today concerning sufficiency of the evidence. We've got to talk about the official acts definition interpreted by the Supreme Court in McConnell. We've got a question about a jury instruction, and we also have a sentencing question. I've been standing here for 35 years arguing cases in this Court, and I still struggle when it comes to the sufficiency of the evidence, with the difference between when a jury is allowed to make a reasonable inference, which means there's sufficient evidence on the one hand, versus cases where this Court has reversed conviction, saying it's just a hunch, it's just a conjecture, it's just piling one inference on top of another. And that's where we have this case on the sufficiency of the evidence question. We've got a repeating fact pattern where the head of an organization, the question is what does that person know, and what are the reasonable inferences that can be led from which a jury could conclude that the government has proven beyond a reasonable doubt that the person at the top of the totem pole, so to speak, knew what underlings were doing. You don't really concede that based on the evidence in this record that there was a conspiracy. As I understand your argument, Mr. Lepore, there isn't enough evidence in this record to establish that Mr. Lepore joined the conspiracy, is that right? Knew of and joined, yes sir. But when he makes statements, there are statements that are attributable to him by, I think it was Clark who testified at the trial, we're in bed with Jackson. He uses the word bribe. He puts his arm around Mr. Jackson and says, you take care of us, we'll take care of you. When we apply our standard of review, could a reasonable jury infer that he joined that conspiracy? Why isn't that enough? Because that's really not what the transcript says if you read it closely. And that's why I went through so meticulously in our reply brief to point out that this is not a transcript that quite says what the government says it, claims that it says. Did he use the word bribe? No. He never used the word bribe? No. It's not there. Here's the classic example, Judge. I think it's at pages 1260-1261. The government asked a series of leading questions saying, you know, what were you guys talking about? What did Mr. Lepore say? And the witness, Mr. Clark, repeatedly to his credit said, I just don't remember exactly what was said. And this — I read — I didn't do the trial. So if I look at the record in this case, there's no evidence that Mr. Lepore, that Mr. Jackson was being provided an apartment at no — there's no — Jackson was being provided that apartment was because of this side deal between Clark and Jackson. Why couldn't the jury infer that? Because there's no evidence to support that. As I said, that's — at the beginning, we are at that point where where is the jumping-off point between a reasonable inference and just a guess or a conjecture? And that's why I cited, right after we filed our briefs, this Court's Luis decision from last summer, where the Court reversed the conviction of Mr. Luis on the lack of knowledge. And the Court pointed out that when it's close, you've got to remember which side has the burden of proof. And we just — when a man's liberty at stake, we have to be vigilant with this standard. Well, the problem with the Luis case, as is the problem with — you alluded to with every sufficiency case, because you have to look at each case separately, is that in that case, all the guy did was drove a truck with a box, stopped, saw the police, and ran. And there was nothing to tie him into knowing what was in the box. Going back to Judge Wilson's question, I'm just looking at parts of the records. And that is, it's in the record that when Clark told Reif about the idea — and that was the idea of the apartment — he responded, well, let me talk to Lepore. And then Clark left the room. Reif came back to Clark and said, yes, Lepore said we can do it. And eventually, Clark and Reif got on the phone with Lepore. And then that was the rationale that it was a corporate apartment. That's all in the record, isn't it? It is. And, Judge, that's why I quoted so extensively the last point you made, the phone call, because I kept expecting — because I didn't do the trial. I said, all right, it's going to come here. It just is not there. That's why I quoted so much of that, to show that these witnesses simply never said that there was a direct conversation with Mr. Lepore. Well, Clark testified that he and Reif got on the phone with Lepore, and that was the rationale that it was a corporate apartment in that discussion. Right. And that's why when you then look at the question and answer about the corporate rationale, it is about who is supposed to sign, not the reason the apartment was leased or the purpose for it in the first place. Weren't there two apartments? There were. The fellow who was bribed took the first apartment for a year, and then he moved into a second apartment. Yes, sir. I think the Court understands our arguments. I'm going to move on to some of the other issues, which is the question of official acts. And I concede, as the government points out, this only deals with the conspiracy and the fraud charges. But this, I think, is going to be the Court's first time to apply the McDonald standard. And it seems to me that we reversed Governor McDonald's convictions for saying, you know, just because somebody sets up a meeting, that's not an official act. I think we have close to that here, especially with the DeKalb County situation involving the fellow who took the bribes, because— Well, you would agree McDonald is not the same statute that your client was convicted of. No, it is the same statute for Counts 1, I think, through 11, which are the fraud charges. It's the Federal Funds bribery, which is a different statute, I believe, Judge Black. But it is still the same honest services fraud language, which applies— So not the same statute, but the same language. Yes, ma'am. Yeah. And so I think that we have, especially with the DeKalb County situation, a far closer question. I'm going to — I've been fighting this fight on the deliberate ignorance jury. The Court gave a McDonald instruction to the jury, right? Yes. And it was in accordance with the McDonald decision. Our position is, using that standard, there still was insufficient evidence of an official act by the person who was bribed. But getting to the jury instructions, I can see this stone case out there that I lost in 1993, which says that if there's no evidence of deliberate ignorance, it's still okay to use the deliberate ignorance jury instruction, because if there was actual knowledge, then there's no harm, basically. It's the only harmlessness per se rule I've ever found. But I think we have a difference here, and this is why. The government asked for it knowing they would never argue it. We are getting to the point. We are — I just finished a trial. Mr. Ghali and I did. We are throwing so many legal concepts at jurors that don't matter that — The government didn't argue deliberate ignorance to the jury? Not once, Judge. And they even conceded that in their brief. They asked for an instruction knowing they would not argue it. I think that's what distinguishes our situation from the stone line of cases, saying that it's per se harmlessness. The Fourth Circuit has distinguished stone in those line of cases. And as far as I've been able to determine, not a single circuit has followed it. But I think our facts here are distinguishable from stone. But it — but the error, if there was an error, it would be harmless if there's sufficient evidence to convict him of the crime. I respectfully — That's what — don't our cases say that? I — stone says that. But I think that's why stone is distinguishable, because here we have the government asking for an instruction knowing they will never argue it. We're engaging in, unfortunately, gamesmanship, it seems to me, where we're — because this — and this is the problem. As I said earlier, when you have the person who's at the top of an organization, and the question is what does that person know, and the jurors are being told something that's almost akin to criminal negligence, there is the real danger that people are getting convicted under a theory for which there's no evidence. Yeah, but he — there is a lot of evidence. Not about his knowledge, is our position, Judge. I understand. There's plenty of evidence that the government says shows knowledge, but I think when you take a very close look at the transcript, it simply evaporates on closer inspection. The sentencing question, I think, is important, not only because it has an impact, but because I think this is the first time the court will have addressed the question under, I think it's Section 2C1.1b3, the four-level enhancement for those bribed people who are either elected in a high-level decision-making position or who have a sensitive position. Now, the bribe recipient here was an elected, so the question is, did he fall within the language high-level decision-maker or sensitive position? The application note, on the other hand, is broader than the guideline. The application note says you don't have to be in a high-level decision-making position, and you don't have to have a sensitive position, as long as you have influence. Well, it says substantial influence over the decision-making process. Right, substantial — but the words substantial influence are not in the guideline approved of by Congress. That's our point. And ever since the Stinson decision from the Supreme Court, which said that while using commentary is perfectly appropriate, it's inappropriate when the commentary is broader than or directly in contrast with the guideline language. You can make a credible argument that Mr. Jackson did not have a substantial influence over the decision-making process with regard to either entity? I can't and I won't. That's not our argument. Our argument is that using the language substantial influence violates the language of the guideline itself, which requires a focus only on the this Court's only binding decision in this area, the Lazar case, where that's what this Court said back in 1994. You look at whether the person who was bribed actually had the authority to make the decision, the final authority. And so while the lower court focused on the bribe recipient Jackson's influence on the process, our position is that such a focus does violence to the guidelines. That's why we quoted last summer the Tejas, T-E-J-A-S, case as supplemental authority, because that was yet one more decision that noted that when there's a conflict between the language of the guideline and a broader application note within the commentary, it is inappropriate to follow that broader language within the commentary. And they, therefore, reversed the enhancement in that case because a district judge did what it seems like happened in this appropriate. I see that the Court has no more questions. I will reserve my time. Thank you. Thank you. Mr. Kish. We'll hear from Mr. Ghali. May it please the Court, Kamal Ghali on behalf of the United States. Substantial evidence supported the jury's verdict in this case that Anthony Lepore was guilty of actively participating in a six-year-long bribery scheme. And if I could highlight an aspect of the record that Judge Wilson referred to just a moment ago, and this is the part where Cecil Clark point-blank says that in 2007, he had an explicit conversation with Anthony Lepore. These are the pages of the transcript, where he says they're on a smoke break, and Mr. Lepore says, quote, basically the gist of it was Patrick is suing us, and if anything ever came up about the apartment or the money, bribes, that the lawsuit would be good cover for us. Mr. Clark's unequivocal on that point. Later in the transcript, Mr. Clark is asked, so when you say cover, you mean if someone accused the company of paying bribes, they could say we are not bribing him? We are even, Mr. Clark says, that would be a defense. But when Mr. Clark is pressed on Mr. Lepore's exact words with respect to cover, he says he can't remember. Later, there's another question about whether Mr. Clark remembers a phrase Mr. Lepore used to describe the ongoing relationship. Mr. Clark cannot remember and asks to have his recollection refreshed with contemporaneous notes he took on the day that Mr. Lepore made these comments, and after he sees those notes, says, yeah, he used the kind of word, we are in bed with Jackson. So when you just look at that type of testimony in the record, especially constrained credibility choices, in the light most favorable to the government, we're beyond Mr. Lepore being aware of a bribery scheme, associating the apartment with bribes. This testimony from Mr. Clark shows that he's now actively in the concealment phase. What would we say when we get caught? The records show that actually in March of 2013, Mr. Lepore did try and use Mr. Jackson's lawsuit as cover in a meeting with the World Congress Center when there was a series of concerns about the contract and the relationship under Mr. Jackson. Mr. Lepore says, well, Mr. Jackson sued us and won. Mr. Cush makes an interesting argument. He looks at our precedent and he says, well, there's no consistency when it comes to, you know, how we decide these appeals based on sufficiency of the evidence in these corruption cases. Why is this case different than United States v. Wilner, a case that we decided in 2015 where we found that the evidence was not sufficient? It's similar to this one. What's your response to that? Your Honor, there are a number of significant differences. The first and foremost before talking about what Wilner says is that this is not a circumstantial evidence case. This is a direct evidence case and it's not a close question. You have testimony like I just talked about with Mr. Clark directly having a conversation with Mr. Lepore, where Mr. Lepore directly authorizes an apportment, directs the chief financial officer to pay for an apartment for Mr. Jackson and uses the phrase, some people are corrupt, where he's putting his arm around the public official saying take care of us, we'll take care of you. Wilner, on the other hand, this court said we begin by noting there is no direct evidence that Dr. Abreu actually knew of or the conspiracy. No witness testified he or she told Dr. Abreu about the conspiracy or witnessed someone doing it. On top of that, if you just look at the role between Dr. Abreu and Mr. Lepore, Dr. Abreu was not the CEO of the company, was not the principal owner. She was a doctor that was there for a 17-month period and paid a salary of $66,000. Mr. Lepore, on the other hand, according to testimony from Mr. Pendleton, made 2% as a bonus of the revenue of operating units and the testimony in this case was that the DeKalb County contract was the second largest contract at Rightway and the Georgia World Congress Center contract was a significant source of revenue. By contrast, this court put, emphasized that there was no evidence that Dr. Abreu gains anything from the conspiracy. The court in Wilner also noted that the sole theory of liability with respect to the charges against Dr. Abreu was that she caused the alteration of patient files to make it look like patients were qualified. This is a much different and much more straightforward scheme. Mr. Lepore paid, authorized payment rather for a luxury apartment for a public official for six years. In 2006, there's testimony he directly authorizes payment on this, for this lease at the same time that they are There's also evidence that in 2007 when Mr. Jackson, when his apartment was foreclosed on, Mr. Lepore, Mr. Reif said to Mr. Clark that he needed to sign the lease because that was Mr. Lepore's direction. There's testimony in the record that even after Mr. Clark left the company and there's now a new Georgia division manager, Brian Domelik, there's testimony that Mr. Lepore and Mr. Reif directed Mr. Domelik to continue renting this luxury apartment for Mr. Jackson. And so this case is materially different than any of the cases. And so with respect to generally these cases and the sufficiency of the evidence, you have cases in the white-collar context where you're trying to infer intent from circumstantial evidence. So the Brown case and Enron case where you're looking at a deal between Merrill Lynch and Enron, those are complex transactions. This is a straightforward scheme that involves corruption, paying Mr. Jackson for beneficial treatment on a number of pending contracts. Now with respect to the sufficiency of the evidence, I will note also that in the context of the long-term scheme and whether Mr. Lepore had any idea that the apartment would be used for a bribe, Mr. Jackson testified that Mr. Clark was his would transmit messages. There's testimony from Mr. Jackson where he said, I wanted a $100,000 lump sum payment at first. And Mr. Clark came back and said, I talked to Lepore, I talked to Reif, and we cannot do it this way. Which means by the time Mr. Lepore is authorizing the apartment, he knows that Mr. Jackson has made a request for a $100,000 payment. So when it comes to the sufficiency of the evidence, again, government stands on its brief and notes that this was not a close case and there was a wealth of record evidence and testimony from insiders about this scheme. So why was there a need for the ignorance instruction? So I'll say two things with respect to that. First, the evidence supported the instruction, and I'll discuss the record, but the notion that the government made the request knowing it would not rely on it is not true. The government is not required to pursue all theories of liability in closing. But in this particular case, the evidence supported the instruction that Mr. Lepore took affirmative steps to avoid knowing details, and that's in two significant ways. First, Mr. Clark testified that Mr. Reif, Mr. Lepore, and him adopted the rationale that it would be a corporate apartment and that Mr. Clark would be the one that would have to sign the leases. So it was structured so that Mr. Lepore didn't have to interact directly with Mr. Clark. He could avoid knowing details about prices, the month-to-month transaction. Well, you didn't make the argument to the jury. I mean, you request the instruction at the end of the case. So obviously, I mean, if you request the instruction, it's reasonable to assume that you're going to make the argument to the jury. Mr. Kish says you didn't make that argument to the jury. You just requested the instruction without making the argument to the jury. Well, Your Honor, as I said a moment ago, I think the government requested the instruction because it was a correct statement of law supported by the facts, and it's similar to the defense's request for a good faith instruction. They requested an instruction that an honestly held belief is not fraud, and that wasn't any argument the defendant made in closing. The arguments in closing were just simply attacks on the credibility of all of the government's witnesses. There was no suggestion that, well, he really just thought it was an apartment that they were paying for six years, and he didn't know if there were any bribes attached because that was not an argument that the defense lawyers chose to pursue. But at least in terms of why the government requested the instruction, it was accurate, and it would not have been appropriate for Mr. Lepore in his closing to argue, well, I just didn't know certain of the details because of the way the instruction, the transaction was structured, and that statement ended up being an accurate instruction on the law. And the district court actually, docket 255, also laid out the district court's belief that this was an appropriate instruction. And so there's, you know, given Stone, given the precedent in this circuit, to the extent that there's any error, it is harmless. I will also note that even with respect to Stone as being somehow a controversial case, I believe Mr. Kish cites U.S. v. Ebert for the more apparent than real. And in the end, the court goes on to say, we therefore apply Stone and hold that an unsupported ostrich instruction is harmless error when the jury is instructed that a precondition to its application is proof beyond a reasonable doubt of deliberate ignorance. But given this court's holdings in Crabtree as well as Stone, the evidence supported the instruction, and in this case, there was actual knowledge as well. With respect to the McDonnell official acts issue, again, the government emphasizes that this argument only applies to counts 2 through 11 in the indictment. Count 1 is a conspiracy count, which was not at issue in McDonnell, and counts 12 through 16 are a federal funds bribery charge where there's no official act requirement. Here, the jury was properly instructed on the definition of official acts, and there were multiple formal exercises of government power by Mr. Jackson. Everything from unilaterally making decisions to renew the contracts in between 2008 through 2011 at DeKalb and Georgia World Congress Center, not formally writing up right way for any performance issues, unilaterally making a request to put the contract out for bid at the Georgia World Congress Center Authority, serving as the committee chair. But he never had decision-making authority in the end though, right? He was always a recommender. I guess it depends what decision we're talking about. I think the court is correct that unilaterally he could not award a contract without any other approval in place. And so he, I mean, I think this is his strongest argument that based on the guideline that was in effect at the time, he may not have been a decision-maker because the guideline was later amended or amended to say, well, you got to have substantial influence over the decision-making process. What's the government's response to that? So you're turning to the sentencing question, the court's application of the guidelines, and I think the court's correct. In 2004, the guidelines were amended. This definition about substantial influence and what a high-level decision-maker is, it was not at play when Lazar was decided in 94. This is an amendment that's in 2004 that clarifies the meaning of that term. Mr. Kish's argument, as I understand it, is that the phrase decision-making somehow implies final authority, but just as the word substantial influence isn't in the guideline, the word final authority isn't in the guideline. And what the district court in this case did didn't actually say it's because of just Mr. Jackson's influence. The district court said when you look at both positions he had, the position he had, the influence he exercised, the deference he was afforded, he was, quote, effectively the decision-maker. I mean, if you take Georgia World Congress Center, for example, they have their cleaning services in-house, and Mr. Jackson essentially is able to create an entire bidding process, condition where he is the committee chair, and there was testimony, a lot of testimony in the record, that all the decision-makers relied implicitly on Mr. Jackson's recommendation. So if you take even just, if you just look up what the word decision-making means, the Black's Law Dictionary, it defines it as the process or practice of making important choices or judgments, especially after a period of discussion or thought. That doesn't say anything about final authority. The notion that we see the word decision-making in the guidelines in self-defining, I don't see any support for that, and certainly no court in the country has held that. By contrast, there is authority applying this application of the guidelines of what high-level decision-making means in this particular context. And to distinguish the U.S. versus Tejas case, where the court recently found that there were certain application notes that were not binding, this is a case where the guidelines just say this is what high-level decision-making means. It's a definition. It's not a special rule like there was in Tejas. In Tejas, the guidelines said you get an enhancement if there's 10 or more victims. And that was, and there was a special rule that said if there's a theft involving mail, we're going to go ahead and assume that there's at least 10 victims. And the court said, well, here it's readily determined there aren't 10 victims, so that special rule contradicts the plain text. Here there's really no reason to believe there are any words in the guideline itself that are in contradiction, unless you're taking the position, which I suppose Mr. Kish's, but it's because he doesn't supply a definition of the term high-level decision-making, and just says, well, decision-making means final authority. Well, wasn't he the manager of services at both of those buildings? Yes, he had slightly different titles. He was the director of building services at Georgia World Congress Center, and he was the manager of custodial services. That's correct, at DeKalb County. And there were a number of decisions where he had essentially unilateral authority. So in years where they could renew the contract, there's conflicting testimony on his authority, but Mr. Jackson testifies point blank, it was up to me whether to renew the contract. So once RightWay wins the bid in 2006, or end of 2006, 2007, annually, it comes up for Mr. Jackson to make, and there's certainly record evidence that would support that inference. And so again, that standard of review, I think, governs how we look at the authority Mr. Jackson exercised. And I think that's part of why the district court reached the conclusion at the sentencing phase that Mr. Jackson was effectively the decision-maker. That in government, you might have a lot of process, and there might be a lot of people along the way, but if you were to identify anyone at both DeKalb County and Georgia World Congress Center, it would be Mr. Jackson alone that was the decision-maker. I'm just curious, how much time did Mr. Jackson get? I'm sorry? How much time did Mr. Jackson get? How much time did Mr.? In prison. He was sentenced to 108 months, I believe. Okay. The same amount as Mr. Lepore? I'm sorry, I guess I misheard the question. Mr. Lepore was sentenced to 108 months. Which defendant were you asking about? Jackson. Mr. Jackson was sentenced to 51 months originally, and then I believe he got a 5k and received somewhere in the range of a six to eight month reduction, I believe. Okay. Thank you, Counsel. We'll hear from Mr. Kish. Judge Wilson, Mr. Jackson got a sentence of 33 months after he testified. The government says that this was a straightforward scheme. I do lots of these cases. I don't see any documents, any e-mails, any communications involving the person who's supposedly approving of this. The government says this case is different than Willner, that that was not a direct evidence case. I beg to differ with my brother, Counsel. I think that if you look at that opinion, it's clear there was all sorts of direct evidence against Dr. Rebreu. The government cites to the conversation about good cover. I simply ask, and again, good lawyers can disagree about what is said, but pages 1261, Clark says, I quote, I don't know exactly if that was his, Lepore's, direct quote. It's been a long time. Right now, I'm drawing a blank after being asked direct questions by the government. The government says about the $100,000 lump payment, here's the way the testimony went. Jackson said, Clark said, Reif said, Lepore said, we can't do it. Clark never said that. He testified for the government, got his reduction to 33 months, and didn't say that. The government talks about, with the deliberate ignorance instruction, that somehow because the defense didn't argue good faith after requesting the instruction, that therefore ameliorates any problem the government caused by requesting instruction that they would never argue. I think we're reversing the burdens here. And I think this is a very dangerous trend that's happening, where we are throwing these confusing instructions at unsuspecting jurors in complex cases and hoping that they'll uncover the matter. So I think the court understands my position. Finally, the sentencing issue. The government says that because there's no definition of decision making in the guideline itself, therefore it's okay to use a definition in the commentary that's broader than the guideline. I think we have to go back to where we started. The guidelines were enacted in 84, but they didn't become effective until 87. We had all the litigation in the late 80s and early 90s about whether they're even constitutional. Mistretta came down, and then so the cases from the early 90s are the first ones interpreting the guideline. Lazar interpreted the same language we have today. Lazar said you have to have authority to make the decision. That's why I use the analogy in my brief, if simply having influence and access to the decision was enough, this Court's law clerks would have decision-making authority. But we all know they don't. It's the final buck, I would submit, is the question that has to be determined on this record. And I would submit that, with all due respect to the government's position, they didn't prove it, and especially because the guideline is narrower than the amendment. I believe the Court understands our arguments. All right. Thank you, Mr. Kish. Yes, sir. Thank you, counsel. The next case is Wolde v. DeKalb County Board of Education.